## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

CLIFFORD BRISENTINE,　　　　　　　]
　　　　　　　　　　　　　　　　　]
　　　Plaintiff(s),　　　　　　　]
　　　　　　　　　　　　　　　　　]
　　　vs.　　　　　　　　　　　　]
　　　　　　　　　　　　　　　　　]　　CV 98-N-1623-NE
STONE & WEBSTER ENGINEERING　　　]
CORP.,　　　　　　　　　　　　　　]
　　　　　　　　　　　　　　　　　]
　　　Defendant(s).　　　　　　　]

ENTERED

AUG 21 1998

### Memorandum of Opinion

In this employment discrimination action, Clifford Brisentine ("Brisentine") has sued

Stone & Webster Engineering Corporation ("S&W"), alleging that S&W denied him

employment in violation of the Americans with Disabilities Act, ("ADA"), 42 U.S.C. § 12101

*et seq.* Specifically, he claims that, even though he has a disability, he can perform the

essential functions of the electrician job, with or without reasonable accommodations, and

that S&W violated the ADA by not allowing him to demonstrate his ability to perform the

electrician's job, nor discussing a reasonable accommodation with him.

On August 9, 1996, this court granted S&W's motion for summary judgment on the

ground that Brisentine's claims were subject to compulsory arbitration. On appeal, the

Eleventh Circuit Court of Appeals reversed, holding that the mandatory arbitration clause

in Brisentine's union collective bargaining agreement does not bar litigation of his federal

statutory claim.[1] *Brisentine v. S&W Engineering Corp.*, 117 F.3d 519, (11th Cir. 1997). On remand, S&W renewed its motion for summary judgment on different grounds. The renewed motion has been briefed and is ripe for decision. Upon due consideration, it will be granted in part and denied in part.

## I.    Statement of Facts.[2]

Brisentine was injured in the fall of 1992 when he fell off a scaffold while working for Westinghouse at the Farley Nuclear Plant. *Brisentine Deposition* at 30. He was treated by several doctors after his injury. *Id.* at 35; Exhibit 1. For thirteen months after his accident, he received workman's compensation benefits of approximately $400 per week, *Id.* at 36, during which time he sought no employment. *Id.* In the fall of 1993, Brisentine went through a work hardening procedure, which concluded with a report that he could resume work immediately in any job where he would not be required to lift more than fifty-eight pounds

---

[1] The Eleventh Circuit held as follows:

. . . as we understand it, a mandatory arbitration clause does not bar litigation of a federal statutory claim, unless three requirements are met. First, the employee must have agreed individually to the contract containing the arbitration clause—the union having agreed for the employee during collective bargaining does not count. Second, the agreement must authorize the arbitrator to resolve federal statutory claims—it is not enough that the arbitrator can resolve contract claims, even if factual issues arising from those claims overlap with the statutory claim issues. Third, the agreement must give the employee the right to insist on arbitration if the federal statutory claim is not resolved to his satisfaction in any grievance process. . . . None of the requirements were met in this case.

*Brisentine v. S&W Engineering Corp.*, 117 F.3d 519, 526-27 (11th Cir. 1997) (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991)).

[2] The facts set out below are gleaned from the parties' submission at the time of the defendant's original motion for summary judgment, filed June 13, 1996. On defendant's renewed motion for summary judgment, filed January 28, 1998, the parties both relied upon their original statement of facts.

In developing the statement of facts in this opinion, the court considered those facts claimed to be undisputed by the parties, the parties' respective responses to those claims, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied*, *USX Corp. v. Cox*, 114 S. Ct. 900 (1995).

2

on an occasional basis. *Id.* at 40-42, Exhibit 3. Brisentine began seeking employment in November of 1993. *Id.* at 44.[3]

On May 9, 1994, Local Union 558 of the International Brotherhood of Electrical Workers ("IBEW") referred Brisentine to S&W for work at the Browns Ferry Nuclear Plant. At that time, S&W acquired electricians through Tom Dougherty ("Dougherty"), labor relations manager for S&W at the Browns Ferry project, who, as workers were needed, would call the union hall to put in a request for the number of men needed. *Gary Fogarty Deposition* at 9. S&W claims that, on May 9, 1994, it was hiring electricians in conduit and cable erection. *See Gary Fogarty Deposition* at 12; *Dunn Deposition* at 83-84, 60, 61. However, Brisentine asserts that S&W was hiring electricians for other positions as well. *See Weaver Affidavit* (stating "[o]n or about May 10, 1994, I was hired by S&W to perform a job of maintenance crew electrician").

Although S&W asserts that it processed the plaintiff's application and other payroll paperwork in accord with its normal procedure, Brisentine asserts that S&W did not follow its written corporate policy, which encourages "affirmative action to employ . . . individuals with disabilities." *See Tawnya Fogarty Deposition* at 12-14; *but see Dunn Deposition* at Exhibit 18, p.48. Brisentine further asserts that S&W did not follow its policy to seek "the advice of the applicant . . . regarding any appropriate accommodation" when the applicant identifies himself as an individual with a disability. See *Dunn Deposition* at Exhibit 18, p.50; *Tawnya Fogarty Deposition* at 21-22. S&W asserts that, in response to an invitation to

---

[3]Brisentine settled his worker's compensation claim against Westinghouse in February, 1994, for $35,459.85. *Brisentine Deposition* at 46, Exhibit 5.

3

indicate whether he wished to identify himself as an individual with a disability, Brisentine declined to do so. *Movant's Statement of Facts in Response to Exhibit D of the Court's Order* at ¶ 8 (citing *Brisentine Deposition* at Exhibit 7, p.6). However, Brisentine did indicate to S&W that he had physical restrictions involving "no heavy lifting" and no "repetitive stooping and bending." *Brisentine Deposition* at Exhibit 7, p.7.

On the advice of Tawnya Fogarty, Plant Access and Training Supervisor for S&W on the Browns Ferry project, Brisentine spoke with Dougherty about his application for employment. *Brisentine Deposition* at 58-59; *Tawnya Fogarty Deposition* at 15, 20. Dougherty advised Brisentine that S&W had no work that he could perform with his limitations.[4] *Brisentine Deposition* at 60. Dougherty documented the conversation in a memo, witnessed by Charles Reyna. *Dougherty Deposition* at Exhibit 3; *see also Brisentine Deposition* at Exhibit 7, p.9. At Dougherty's direction, Tawnya Fogarty checked Brisentine out of the Browns Ferry project. *Tawnya Fogarty Deposition* at 21-22. The paperwork for Brisentine's check out indicated that Brisentine was "physically unable to perform" the duties of the electrician job. *Brisentine Deposition* at Exhibit 7, p.12.

As of November 1993, according to Dr. Richard Rosenberg of Las Vegas, Nevada, Brisentine's restrictions were that he lift no more than 30-45 pounds and engage in no repetitive stooping and bending. *Id.* According to Brisentine, "[Dr. Rosenberg] told me I may get some better but he couldn't say precisely. Some people do and some people don't, I could get worse just as well as I could get better." *Id.* at 45; *see also Rosenberg*

---

[4] One of the things Dougherty told Brisentine was that the available work required crawling. *Dougherty Deposition* at Exhibit 2. Brisentine has no medical restrictions limiting crawling. *Rosenberg Deposition* at 19, 20.

*Deposition* at 20-21. The medical restrictions Brisentine communicated to S&W in May of 1994 were based on a letter Dr. Rosenberg wrote in the fall of 1993. *Brisentine Deposition* at 44-45; *see also Rosenberg Deposition* at Exhibit 1 (setting lifting restrictions at thirty to forty-five pounds). Brisentine's last medical evaluation of his back problem is summarized in a report from a Dr. Griffin of Charlotte, North Carolina, dated December 30, 1993, which allowed him to return to work but restricted him from lifting more than thirty-five pounds and from repetitive bending and stooping. *Brisentine Deposition* at Exhibit 6. Brisentine stopped seeing Dr. Griffin because, according to him, he "felt no need to" as he "was doing better." *Id.* at 48. Brisentine explained: "I wasn't having a problem with my back at that time. The only time I was allowed to see a doctor was when I had a problem, but, at that time, I wasn't having a problem with that." *Id.* Brisentine has not had any medical treatment for his back since February of 1994. *Id.*

The plaintiff explained his restriction against heavy lifting as follows:

> [My restriction] doesn't foreclose me from very many jobs, no, because most heavy jobs, as I said, don't last that long. You only lift for a short period of time, its not something, you don't do it every single day, all day long, that's not what you do. There are very few jobs like that, at least any jobs that I have done. That's my own personal experience, I would say.

*Id.* at 112. Brisentine's certified rehabilitation counselor, testified that Brisentine had access to 49.82 percent of U.S. jobs before his injury, and now has access to 35.15 percent of all U.S. jobs. *Bramlett Affidavit* at Attachment, p.2.

Brisentine further explained his limitations as follows:

A.   Well, I still have to watch what I do, but as far as missing work because of it, no I have not missed any work.

5

Q.    What do you mean you have to watch what you do?

A.    I have to make sure I don't bend in the wrong direction. When you go through the work hardening program that's what they teach you, how to bend and stoop in the correct manner.

Q.    Is that called good body mechanics?

A.    Correct.

*Id.* at 183. Brisentine has worked as an Industrial Electrician without difficulty since February of 1994. *Id.* at 183.

Gary Fogarty was the lead electrical field supervisor for S&W on May 9, 1994. *Gary Fogarty Deposition* at 7. According to Fogarty, as of May 9, 1994, as many as 422 electricians could have been working at the Browns Ferry Nuclear Plant through S&W. *Id.* at 11. Fogarty testified that there were no written requirements as to what an electrician does. *Id.* at 21. However, Gary Fogarty described the essential functions of the electrician's job in conduit and cable erection as follows:

A.    The essential functions would be to install conduit supports, attach conduit to those supports, pull cable, and terminate the cable.

Q.    And what physical requirements would the person need to be able to accomplish in order to do that as far as lifting, mounting—lifting, bending, stooping—those things?

A.    We—of course, on a powerhouse that size you have several locations that requires this work. Most of the work we were doing was in the reactor building. In the reactor building the work involved to perform that task would be anything from core drilling of conduit, drilling holes for anchors, lifting conduit up to attach to those supports, climbing scaffold, climbing under cable tray—

Q.    What about the amount that a person would have to lift, an individual, one person?

                        .        .        .

6

A.     Some of our supports would weigh 2 or 3 pounds.  Some of them
       would weigh 200 pounds.  Conduit varies in sizes.  It goes from 1-inch
       conduit to 5-inch conduit, 10-foot pieces is what you work with, so you
       are looking at anywhere from 10 pounds to 90 pounds, I would guess
       on a piece of conduit.

Q.     So, if you are dealing with a 10-foot piece of conduit that might weigh
       90 pounds, then you would have two people available to lift that?

A.     Well, usually you would have one person on the ground and the other
       person handing it up to him, so at any given time, one person probably
       is going to handle that piece of conduit by himself.

*Gary Fogarty Deposition* at 12-14.

Wyatt Metcalf is an IBEW electrician who worked at S&W running conduit and terminating and pulling cables from approximately February 7, 1994, through January 17, 1995.  *Metcalf Affidavit*.[5]  Metcalf states in his affidavit that the lifting required by his job at S&W involved two or more people.  *Id.*  He further states that one person lifting in the range of thirty-five to forty-five pounds would be able to perform the cable and conduit work, and that the cable and conduit work did not involve repetitive stooping and bending.  *Id.*

Stanley Randolph Price is an IBEW electrician who worked at S&W terminating cables from approximately February 7, 1994, through January 17, 1995.  *Price Affidavit*.  Price states in his affidavit that his work at S&W involved lifting very small weights and that he could have performed his job with a weight limitation of thirty pounds and with no repetitive bending and stooping.  *Id.*  He further states that he is familiar with the conduit erection crew work at S&W, and that the duties involved with the conduit erection crew would not

---

[5] The affidavit of Wyatt Metcalf, submitted by Brisentine on July 15, 1996, as evidence in opposition to S&W's original motion for summary judgment, was subject to S&W's motion to strike, filed July 18, 1996, which motion to strike became moot upon the court's grant of summary judgment in this case, and which motion to strike was not renewed by S&W when it renewed its motion for summary judgment on remand.

7

require lifting more than thirty to thirty-five pounds and would not require repetitive bending or stooping. *Id.*

James Crunk is an IBEW electrician who was hired by S&W to perform conduit erection on May 9, 1994; Crunk worked at S&W through June of 1995. *Crunk Affidavit.*[6] Crunk states in his affidavit that his work at S&W included a position as foreman in the fabrication shop. *Id.* He further states that he is familiar with the jobs at S&W for conduit erection, temporary maintenance, and facility's maintenance, all of which involve an electrician; that the lifting requirements of the conduit erection job are approximately five to forty pounds for one person, and the conduit erection job involves two or more electricians lifting a given weight; that the requirements of the temporary maintenance electrician's job and the facilities maintenance electrician's jobs are very minimal and do not require lifting significant amounts of weight; and that the jobs of conduit erection, temporary maintenance, and facilities maintenance do not require any repetitive bending and stooping to perform the job. *Id.*

Jack Weaver is an IBEW electrician who was hired by S&W to perform the job of maintenance crew electrician on May 10, 1994, the day after Brisentine was denied employment because of his restrictions. *Weaver Affidavit.*[7] Weaver worked at S&W until April 1996. *Id.* Weaver states in his affidavit that the lifting obligations of the maintenance

---

[6] Like the *Metcalf Affidavit*, the affidavit of James D. Crunk was subject to S&W's motion to strike as evidence in opposition to S&W's original motion for summary judgment, which motion to strike was not renewed by S&W when it renewed its motion for summary judgment on remand. *See supra* note 5.

[7] Like the *Metcalf Affidavit* and the *Crunk Affidavit*, the affidavit of Jack P. Weaver, Sr. was subject to S&W's motion to strike as evidence in opposition to S&W's original motion for summary judgment, which motion to strike was not renewed by S&W when it renewed its motion for summary judgment on remand. *See supra* notes 5 & 6.

8

crew electrician were minimal, much less than thirty pounds, and his work as a maintenance crew electrician did not require any repetitive stooping or bending. He further states that he is familiar with the requirements of the conduit erection job at S&W; that the conduit erection crew job required one person to lift between thirty and thirty-five pounds; that the conduit erection job involved two or more persons lifting conduits; and that there were no requirements of repetitive bending or stooping in the conduit erection crew. *Id.*

Kenneth Mullinax is an IBEW electrician who was hired by S&W to perform conduit erection on May 9, 1994. *Mullinax Affidavit.*[8] Mullinax states in his affidavit that he is familiar with the job of conduit erection at S&W. *Id.* He further states that in order to do this job two people needed to lift between five and 100 pounds, and the electricians worked in teams of two or more people; that the Tennessee Valley Authority had safety requirements that required an individual to lift thirty-five to forty-five pounds in order to do the conduit erection job; and that if the lifting on the conduit erection job involved weights that were too high, forklifts and cherry pickers were available to assist. *Id.*

George Burt is an electrician who made a statement to the Office of Federal Contract Compliance Programs ("OFCCP") on April 19, 1995, regarding Brisentine's OFCCP complaint against S&W. *Opponent's Responsive Submission in Response to Exhibit D of the Court's Order ("Response")* at Exhibit 15. S&W hired Burt on May 9, 1994. *Dunn Deposition* at Exhibit 33. In his OFCCP statement, Burt declares that he was an "S.W.

---

[8]Like the *Metcalf Affidavit*, the *Crunk Affidavit* and the *Weaver Affidavit*, the affidavit of Kenneth L. Mullinax, was subject to S&W's motion to strike as evidence in opposition to S&W's original motion for summary judgment, which motion to strike was not renewed by S&W when it renewed its motion for summary judgment on remand. *See supra* notes 5, 6 & 7.

9

electrical inside wire man," performing conduit and support work. *Response* at Exhibit 15, p.2. Burt further declares that he was required to lift between zero and fifty-five pounds. *Id.*

Vincent D. Magro is an electrician who made a statement to OFCCP on April 19, 1995, regarding Brisentine's OFCCP complaint against S&W. *Response* at Exhibit 16. Magro was hired by S&W on May 9, 1994. *Dunn Deposition* at Exhibit 33. In his OFCCP statement, Magro declares that he was an "electrician (inside wire man)," performing conduit and support work. *Response* at Exhibit 16, p.2. Magro further declared he was required to lift between one and fifty-five pounds. Light duty jobs for electricians at S&W, which did not require lifting more than forty pounds or any climbing or frequent bending and stooping, included installing small conduit, terminating cables, control work, and fire watch. *Id.* at 2-3.

At the time S&W refused Brisentine employment, Vincent Dunn was Human Resources Manager at S&W, in charge of equal employment opportunity and affirmative action compliance. *Dunn Deposition* at 10. Ronald Frazier was the manager in charge of placing electricians. *Frazier Deposition* at 8. Dunn had a conversation with Frazier concerning the requirements of the conduit erection job, which he memorialized in a memo:

> I asked Mr. Frazier about the duties of an electrician, specifically those which would have been required during the 6 months. Although somewhat difficult to define, due to the nature of the crew assignment method, Mr. Frazier did note that his only add-on work for sometime had been in cable and conduit. The work involves two electricians lifting 10-foot lengths of conduit weighing from 70 to 90 pounds depending on the size of the conduit, from 1 inch to 1-and-a-half inches. Also involved was climbing as the work is done in the

10

ceiling. I asked if any accommodations were requested specifically for Mr. Brisentine. Mr. Frazier stated that he does not recall such a request, but one would be hard to make. Currently the only work not being done as above is in the CRDR—which would have been in the control room design review—although some less taxing, a swap of one of the electricians currently assigned to CRDR may create labor strife . . . .

*Dunn Deposition* at 60-61. According to Dunn Frazier never said in this conversation that Brisentine could not do the conduit electrician erection crew job, only that "he said he would have a difficult time." *Id.* at 62. Dunn testified that conduits weighed from five to one-hundred pounds, but that no one on a conduit erection crew would be required to lift one-hundred pounds. Any lifting that heavy would be performed by at least two people. *Id.* at 54, 124-127. Furthermore, Frazier testified that an electrician on a conduit erection crew would not be working by himself, but rather in groups of 2 to 4 electricians, depending upon the size and weight of the conduit. *Frazier Deposition* at 39, 40. However, Frazier testified that some electrician positions required lifting base plates of eighty to 120 pounds. *Id.* at 31.

Dunn testified that S&W seeks out disabled employment candidates and seeks to promote and retain such employees as best they can. *Dunn Deposition* at 28. He testified that if Dougherty had a question about the ADA as of May 9, 1994, Dougherty should have contacted him. *Id.* at 42, 43. According to Dunn, Dougherty did not discuss the possibility of accommodation with Brisentine, even though Brisentine came back to Dougherty's office to determine why he was being refused employment. *Id.* at 49, 50. Dunn testified that:

It is the responsibility of any manager or supervisor who was aware of the potential situation involving an individual with a disability to advise the Human Resources Manager at that location and the civil rights officer that the

11

situation was there and then make a determination whether or not an accommodation could be made in the case of someone with a disability.

*Id.* at 104. Dunn was not contacted about Brisentine's situation on May 9, 1994, by Dougherty or otherwise. *Id.* at 105, 106; *Dougherty Deposition* at 42-43.

Charles Reyna was the safety supervisor at S&W on May 9, 1994. *Reyna Deposition* at 5. He dealt with employees who were under a doctor's restrictions to make sure that they returned to work as soon as possible. *Id.* at 21. Reyna testified that injured employees were sent to a panel of doctors for evaluations, if necessary. *Id.* at 35. According to Reyna, if an individual had a restriction of heavy lifting, a request for information would be made to the physician giving the restriction. *Id.* at 37. Reyna went to Dougherty's office on May 9, 1994, at Dougherty's request. *Id.* at 17. However, Reyna has no knowledge of any request for information made by S&W to any of Brisentine's physicians. *Id.* at 35. From April of 1994 to the date of his deposition in May of 1996, Reyna could recall only one individual who worked at S&W with an impairment or a disability. *Id.* at 43.

When S&W refused to hire Brisentine, he approached his union about filing a grievance, and was advised to file a charge with the Equal Employment Opportunity Commission ("EEOC"). *Brisentine Deposition* at 117, 205, 206. Brisentine wrote to the EEOC, claiming discrimination under the ADA, in May of 1994, and he filed an EEOC charge in October of 1994. *Id.* at 72, Exhibit 20, 21.

12

Brisentine also filed a charge of discrimination based on a claim of disability with the OFCCP on August 24, 1994. *Id.* at Exhibit 10. Brisentine complained that S&W hired him[9] and then terminated him after he completed an employment form indicating that he had medical restrictions, and that S&W failed to give him a chance to demonstrate his ability to perform the job or discuss a reasonable accommodation. *Dunn Deposition* at Exhibit 26. The OFCCP investigated Brisentine's charge, requesting information from Brisentine and from S&W; the defendant replied to Brisentine's OFCCP charge that "an error in judgment may have occurred," and that in Brisentine's case it was not clear that a thorough review of available opportunities was, in fact, conducted. *Dunn Deposition* at Exhibit 26. On April 19th and 20th of 1995, OFCCP conducted an on-site investigation of Brisentine's charge of disability-based employment discrimination. *Id.*

In December of 1994, S&W communicated an offer of employment as a journeyman electrician at the Browns Ferry Plant to Brisentine through the OFCCP. *Brisentine Deposition* at 196-97; *Dunn Deposition* at 118, Exhibit 16. This position as an industrial electrician would have required cable and conduit erection. *Brisentine Deposition* at 186, Exhibit 18. *Dunn Deposition* at Exhibit 16. Brisentine declined S&W's offer in December of 1994, declaring it not a bona fide offer because of the stated lifting requirements of up to 100 pounds. *Brisentine Deposition* at 187, Exhibit 24.

---

[9] Reyna and Dougherty testified that Brisentine was never an S&W employee. *Reyna Deposition* at 33; *Dougherty Deposition* at 20. On the other hand, Tawnya Fogarty, the S&W employee in charge of processing Brisentine into S&W on May 9, 1994, stated that he was in a gray area as to whether or not he was actually an employee. *Tawnya Fogarty Deposition* at 22, 23.

Although disputed by S&W, the OFCCP investigation found that Brisentine was terminated on May 9, 1994, based upon his medical restrictions. *Dunn Deposition* at Exhibit 27. Further findings of the OFCCP include: (1) the duty of each electrician's job does not require lifting more than forty pounds and does not require repetitive stooping or bending; (2) S&W's termination of Brisentine violated 41 C.F.R. § 60-741.4(a); (3) Brisentine was an individual with a disability within the meaning of the ADA; (4) S&W terminated Brisentine based upon a belief that he was physically unable to perform the job duties of an electrician; (5) the terminating official failed to determine whether Brisentine was capable of performing one or more of the 422 electricians positions at the Athens, Alabama site; and (6) Brisentine could safely perform a selected group of electricians' positions given a reasonable accommodation.[10] *Id.*

S&W subsequently entered into a Conciliation Agreement with the OFCCP concerning Brisentine's charge, under which S&W agreed to pay Brisentine $31,628.74, the amount determined by OFCCP to represent full back pay (without any deduction for interim earnings[11]) from May 9, 1994, through December 6, 1994, the date of S&W's job offer. *Dunn Deposition* at 183, Exhibit 36. S&W delivered to Brisentine its Check Number 33-05732, representing the gross amount of $31,628.74, subject to income tax withholding and other

---

[10]These findings of course, directly contradict Brisentine's contention that the December job offer was not bona fide because of the stated lifting requirement.

[11]In his complaint to the OFCCP, Brisentine responded, under oath, to a question about his interim earnings and any unemployment pay, stating that he had "no unemployment pay;" *Brisentine Deposition* at Exhibit 24, ¶ 9; when, in fact, he had worked for Fluor Constructors at the Joseph M. Farley Nuclear Plant in Dothan, Alabama, in the fall of 1994; *Id.* at 129.; and had earned several thousand dollars; *Id.* at 175.

legal deductions, for a net amount of $19,689.46.[12] *Brisentine Deposition* at 107-08. Brisentine has made no further application to S&W since he rejected the position offered in December of 1994. *Id.* at 68, 92. He has, however, worked for Fluor Constructors at Farley Nuclear Plant and other employers as an industrial electrician from time to time. *Id.* at 179.

## II. Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movants can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

---

[12] At the time of his deposition, March 28, 1996, Brisentine testified that he had neither cashed the check nor returned it to S&W. *Id.* However, on July 26, 1996, Brisentine returned the check to S&W. *Opponents Responsive Submission in Response to Exhibit D of the Court's Order* at Exhibit 18.

15

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex*, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 745 n.11(1983). However, the nonmoving party "must do more than

16

show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. Discussion.

In its original motion for summary judgment, filed June 13, 1996, S&W sought dismissal of the claims against it on the following grounds: (1) Brisentine is not "disabled" within the meaning of the ADA; (2) Brisentine is not a "qualified" individual with a disability within the meaning of the ADA; (3) Brisentine failed to exhaust the grievance and arbitration procedure in his collective bargaining agreement; and (4) Brisentine's back-pay claim is limited by S&W's offer of employment in December of 1994. *See Movant's Initial Submission in Response to Exhibit D of the Court's Order*, filed June 13, 1996. This court granted summary judgment in favor of S&W based solely on Brisentine's failure to exhaust

17

the grievance and arbitration procedure in his collective bargaining agreement. *See Memorandum of Opinion*, entered August 9, 1996. On August 19, 1997, the Eleventh Circuit reversed, holding that Brisentine's claim was not subject to compulsory arbitration. *Brisentine*, 117 F.3d 519. No court has ever considered the other grounds upon which S&W sought summary judgment.

On its renewed motion for summary judgment, S&W has submitted no additional evidence, but rather has relied on the evidence that was before the court at the time of its own original summary judgment order. Id. at ¶ 4. This court now must consider each of the alternative grounds presented by S&W in its original motion. *See Litman v. Massachusetts Mut. Life Ins. Co.*, 825 F.2d 1506, 1511 (11th Cir. 1987) (en banc) ("The district court may address issues not disposed of on appeal."), *cert. denied*, 484 U.S. 1006 (1988); *Piambino v. Bailey*, 757 F.2d 1112, 1120 (11th Cir. 1985) (a district court on remand "is free to address, as a matter of first impression, those issues not disposed of on appeal."), *reh'g denied*, 763 F.2d 419 (1985), *cert. denied sub nom. Hoffman v. Sylvia*, 476 U.S. 1169 (1986).

In order to establish a prima facie case of employment discrimination under Title I of the Americans with Disabilities Act the plaintiff must present evidence sufficient to justify a jury in finding: (1) the plaintiff has a disability under the ADA; (2) the plaintiff is a "qualified individual" under the ADA; and (3) the plaintiff was subjected to unlawful discrimination because of his disability by his employer. *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996). S&W asserts that it is entitled to summary judgment on all of Brisentine's claims against it first because Brisentine is not within the protected class of individuals with a "disability" under the ADA and second because Brisentine is not a "qualified" individual

18

with a disability within the meaning of the ADA. S&W makes no argument as to the third element of Brisentine's prima facie case, and the evidence would support finding that S&W did not employ Brisentine because of his alleged back condition. Essentially, the defendant argues that Brisentine cannot establish a prima facie case of disability discrimination.

An ADA plaintiff can prove the first element of his prima facie case in either of three alternative ways because the statute defines a "disability" as follows: (1) "a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(2). "Major life activities" are defined as "those basic activities that the average person in the general population can perform with little or no difficulty." 29 C.F.R. § 1630.2(i) (App.). They include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* "An impairment is substantially limiting if it significantly restricts the duration, manner or condition under which an individual can perform a particular major life activity as compared to the average person in the general population's ability to perform that same major life activity." 29 C.F.R. § 1630.2(j) (App.). In determining whether an impairment substantially limits a major life activity, the court should consider: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long-term impact, of or resulting from the impairment. 29 C.F.R. § 1630(j)(2).

In the instant case, one way that Brisentine can prove the first element of his prima facie case is by proving that he actually suffers from a disability under the ADA. 42 U.S.C.

§ 12102(2)(A). In this regard, the bulk of the evidence weighs against such a finding. Brisentine injured his back on October 2, 1992. After undergoing rehabilitation, he was certified to return to work with some restrictions, and evidence in the record suggests that Brisentine did work after his injury. Furthermore, Brisentine does not point to any other major life activity that is substantially limited by his injury. Nonetheless, the fact that the OFCCP found Brisentine to be an individual with a disability under the ADA is sufficient evidence, if construed in a light most favorable to Brisentine, upon which a reasonable jury might find that he meets the ADA definition of an individual with a disability.

Alternatively, Brisentine can prove the first element of his prima facie case by showing that S&W regarded him as an individual with a disability under the ADA. 42 U.S.C. § 12102(2)(C). Sufficient evidence exists in the record on S&W's motion for summary judgment upon which a reasonable jury could find that S&W perceived Brisentine as disabled under the ADA. Accordingly, construing all the evidence in a light most favorable to the plaintiff, S&W is not entitled to judgment as a matter of law with regard to the first element of Brisentine's prima facie case.

In order to prove the second element of his prima facie case, Brisentine must prove that he is a "qualified individual" as defined by the ADA. *Morisky*, 80 F.3d at 447. The statute defines a "qualified individual" with a disability as a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). Under the statute, consideration is given to the

employer's judgment as to what functions of a job are essential. 42 U.S.C. § 12111(8). If an employer has prepared a written description before advertising or interviewing applicants for the job, the description is evidence of the essential functions of the job. *Id.*

In this case, in response to S&W's motion for summary judgment, Brisentine has presented evidence sufficient to create an issue of fact over whether, with or without reasonable accommodation, he could perform the essential functions of the job he sought at S&W. Accordingly, S&W is not entitled to judgment as a matter of law with regard to the second element of Brisentine's prima facie case.

S&W argues that, even if Brisentine is entitled to submit his claims to a jury, he is not entitled to a back pay award as a matter of law for any time after he declined S &W's December 6, 1994, offer of employment. Indeed, an employer can toll accrual of back pay liability by unconditionally offering to a claimant the job that the claimant sought. *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982) (Title VII case); *see also Cowen v. Standard Brands, Inc.*, 572 F. Supp. 1576, 1581 (N.D. Ala. 1983) (ADEA case). If a claimant minimizes his damages by accepting the defendant's unconditional offer of the job originally sought, the claimant remains entitled to full compensation if he wins his case, and a court may grant him back pay accrued prior to the effective date of the offer. *Ford Motor Co.*, 458 U.S. at 233. However, if the claimant does not accept the defendant's offer, any back pay award to which he is entitled is tolled on the date he rejects the offer. *Id.* at 238-39.

Brisentine argues that S&W's offer of employment, requiring him to lift 100 pounds, does not cut off his back-pay claim because it was not an unconditional offer of employment and because it was made in "bad faith" when S&W knew its lifting requirement was beyond

21

Brisentine's alleged ability. In order to cut off back pay liability, the offer must be unconditional. See *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 879 (11th Cir. 1986) (offer was conditional when the claimant was invited "to submit an application" for one of an undisclosed "number of vacancies," and that there was a "good chance" the claimant would be hired if she were "minimally qualified"); *see also Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614, 625 (6th Cir.1983) (an interview letter is not an unconditional offer of employment), *cert. denied*, 466 U.S. 950 (1984). Even if the defendant's job offer to a claimant is made in "good faith," the back pay award is not tolled if the claimants rejection of the job offer is "reasonable." *Lewis v. Federal Prison Industries, Inc.*, 953 F.2d 1277, 1279 (11th Cir. 1992) (ADA case). For example, a claimant's personal decision to reject the defendant's job offer because of the death of her husband was not reasonable. *Stanfield v. Answering Service, Inc.*, 867 F.2d 1290, 1296 (11th Cir. 1989) (ADEA case). But, a claimant's rejection of a job offer was reasonable where he had "emerged from an antagonistic, discriminatory work environment with an emotional disturbance that rendered him unfit to return to that environment." *Lewis*, 953 F.2d at 1280; *cf. Stamey v. Southern Bell Tel. & Tel. Co.*, 658 F. Supp. 1152, 1154-55 (N.D. Ga. 1987) (rejecting plaintiff's argument that workplace was "too hostile toward her to allow reinstatement"), *aff'd on other grounds*, 859 F.2d 855 (11th Cir. 1988). "In determining whether the right to relief extends beyond the date of an offer of reinstatement, the trial court must consider the circumstances under which the offer was made or rejected, including the terms of the offer and the reasons for refusal." *O'Donnell v. Georgia Osteopathic Hosp., Inc.*, 748 F.2d 1543, 1550-1551 (11th Cir. 1983)

22

(quoting *Claiborne v. Illinois Central R.R.*, 583 F.2d 143, 153 (5th Cir.1978), *cert. denied*, 442 U.S. 934 (1979)).

S&W made Brisentine an unconditional offer of employment for what was substantially the same position on substantially the same terms as the original position for which he claims he was rejected in May 1994. According to his own testimony, Brisentine rejected that offer, at least in part, because of his concerns over his pending back pay settlement and because he thought that he was entitled to punitive damages. *Brisentine Deposition* at 108, 196, 213.

This rejection was in spite of his present claim that he was denied an opportunity to demonstrate in May of 1994 that he was able to perform the essential functions of the job with an accommodation. When given the opportunity to demonstrate that he could do the job, Brisentine rejected it. Moreover, the OFCCP had already found that: (1) the duties of each of the electrician's jobs did not require lifting more than 40 pounds; (2) the jobs did not require repetitive stooping or bending; and (3) the plaintiff could safely perform a selected group of electricians positions with reasonable accommodation. Mr. Brisentine has, of course, produced the affidavits of several individuals who claim that the lifting and bending requirements for electricians at S&W were within his capabilities. At least some of this testimony was available to him when he rejected the offer of a job.

Construing all the evidence in a light most favorable to the plaintiff, the court concludes that no reasonable jury could find that Brisentine's rejection of the defendant's offer of employment was reasonable. Accordingly, Brisentine's claim for back pay is limited to the time period preceding December 6, 1994, as a matter of law.

23

A separate order, consistent with this opinion, will be entered.

Done, this ___2½st___ of August, 1998.

_____
EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE